******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# DEVONTE DALEY *v.* ZACHARY KASHMANIAN ET AL.
## (SC 20498)

Robinson, C. J., and McDonald, D'Auria,
Kahn, and Ecker, Js.

*Syllabus*

Pursuant to statute (§ 52-557n (a) (2) (B)) and the common law of this state, respectively, municipalities and their employees enjoy qualified immunity from liability for their negligent acts or omissions in the performance of duties that require the exercise of judgment or discretion.

The plaintiff sought to recover damages from the defendants, the city of Hartford and one of its police officers, K, in connection with injuries the plaintiff sustained when a motorcycle on which he was riding was struck from behind by K's unmarked police vehicle. K's vehicle, known as a "soft car," lacked flashing or revolving lights and was indiscernible from an ordinary civilian vehicle. While driving his vehicle, K was instructed to surveil a group of motorcycles and quads riding through the city streets. K, who was traveling between forty and fifty miles per hour in a twenty-five mile per hour zone, crossed the street's center line and proceeded to travel north in the southbound lane, where the front of his vehicle struck the back tire of the plaintiff's motorcycle, causing the plaintiff to crash and sustain serious injuries. The plaintiff alleged, inter alia, that K's negligence had caused his injuries and that the city was liable pursuant to § 52-557n (a) (1) (A) for the negligent acts of K and was required to indemnify K pursuant to the municipal indemnification statute (§ 7-465). Specifically, the plaintiff claimed that K had violated a ministerial duty imposed by the motor vehicle statutes ((Rev. to 2013) §§ 14-218a and 14-240) that govern speed on local roadways and following distances, respectively, and the statute ((Rev. to 2013) § 14-230) that requires vehicles to be driven on the right. The defendants asserted various special defenses, including governmental immunity pursuant to the common law and § 52-557n (a) (2) (B). After a trial, the jury returned a verdict for the plaintiff on his negligence claim, and the court then heard argument on the issue of governmental immunity, which had been reserved for the court's decision. The court ultimately set aside the verdict on the negligence count, concluding that governmental immunity was applicable to K's conduct because his surveillance while driving involved a discretionary, rather than a ministerial, police activity. Accordingly, the court also concluded that there was no cognizable claim against the city for indemnification under § 7-465, and it rendered judgment for the defendants. On appeal, the Appellate Court upheld the trial court's decision to set aside the verdict with respect to the negligence claim, concluding that it was barred by governmental immunity because K was engaged in discretionary conduct while surveilling the plaintiff. The Appellate Court also rejected the plaintiff's argument that K had a ministerial duty to comply with the motor vehicle statutes while operating his vehicle, insofar as the statute (§ 14-283) governing the operation of emergency vehicles allows the police to disregard motor vehicle statutes only when responding to an emergency call or during pursuits but not during surveillance operations. On the granting of certification, the plaintiff appealed to this court. *Held* that the Appellate Court incorrectly concluded that the defendants were entitled to governmental immunity pursuant to the common law and § 52-557n (a) (2) (B) in connection with the plaintiff's negligence claim, as the motor vehicle statutes setting forth the rules of the road imposed numerous ministerial duties that K violated in the operation of his vehicle, and, accordingly, this court reversed in part the Appellate Court's judgment and remanded the case with direction to reverse that part of the trial court's judgment setting aside the verdict and to remand the case to the trial court with direction to, inter alia, reinstate the jury's verdict and to render judgment for the plaintiff on the count of his complaint seeking indemnification from the city: because the statute was silent and was, therefore, ambiguous with respect to whether, or the extent to which, a municipal employee's manner of driving is consid-

ered a discretionary act for purposes of governmental immunity under § 52-557n (a) (2) (B), this court reviewed extratextual sources, particularly the statute's legislative history, which demonstrated the legislature's understanding that negligence in the operation of motor vehicles was not intended to be shielded by governmental immunity, either before or after the passage of § 52-557n, and that understanding was implicitly confirmed by a nearly contemporaneous decision of this court holding that a municipality is liable for its employee's negligent operation of an emergency vehicle engaged in a high-speed police pursuit and rejecting a claim of blanket immunity under § 14-283; moreover, in the absence of any indication in the text or legislative history of § 52-557n that the legislature intended to alter or abolish the existing liability regime under the common law and related indemnification statutes, this court concluded that the legislature understood the operation of a motor vehicle in a nonemergency situation to be a ministerial act, and that conclusion was consistent with the fact that the operation of a motor vehicle is a highly regulated activity governed by a panoply of state motor vehicle statutes; furthermore, a review of the pertinent motor vehicle statutes, namely, §§ 14-218a, 14-230 and 14-240, established that those statutes impose ministerial duties on municipal employees who are operating a motor vehicle, outside of the limited shelter provided by § 14-283 for the operators of emergency vehicles in certain discrete circumstances, as the former statutes contain mandatory language that limits discretion in the performance of the mandatory act and does not call for the kind of open-ended good professional judgment that is the hallmark of discretionary act immunity; in the present case, although the decision to use the soft car to surveil the plaintiff was discretionary, once that decision was made, K had a ministerial duty and was legally bound to comply with the rules of the road, unless he was operating his vehicle as an emergency vehicle within the meaning of § 14-283, which the defendants conceded that he was not.

Argued December 15, 2021—officially released August 30, 2022

*Procedural History*

Action to, inter alia, recover damages for the alleged negligence and recklessness of the named defendant, and for other relief, brought in the Superior Court in the judicial district of Hartford and tried to the jury before *Scholl, J.*; thereafter, the court, *Scholl, J.*, which granted the named defendant's motion for a directed verdict on the recklessness claim, and the jury returned a verdict for the plaintiff on his negligence claim; subsequently, the court, *Scholl, J.*, set aside the verdict and rendered judgment for the defendants, from which the plaintiff appealed to the Appellate Court, *Keller, Bright* and *Harper, Js.*, which reversed in part the judgment of the trial court and remanded the case for a new trial on the recklessness count, and the plaintiff, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*.

*Martin McQuillan*, for the appellant (plaintiff).

*William J. Melley III*, for the appellee (named defendant).

*Nathalie Feola-Guerrieri*, senior assistant corporation counsel, for the appellee (defendant city of Hartford).

*Sarah Steinfeld* and *Erica Ryan Moskowitz* filed a brief for Moral Monday CT et al. as amici curiae.

*Julianne Lombardo Klaassen* and *James J. Healy* filed a brief for the Connecticut Trial Lawyers Associa-

tion as amicus curiae.

*Opinion*

ROBINSON, C. J. The sole issue in this certified appeal is whether a police officer who was involved in a crash while using an automobile to perform surveillance during an investigation of possible criminal activity was engaged in a discretionary act for purposes of governmental immunity under the common law or General Statutes § 52-557n (a) (2) (B).[1] The plaintiff, Devonte Daley, appeals, upon our grant of his petition for certification,[2] from the judgment of the Appellate Court reversing in part the judgment of the trial court, rendered in favor of the plaintiff after a jury trial, in this personal injury action against the defendants, Zachary Kashmanian, a police officer, and his employer, the city of Hartford (city). See *Daley* v. *Kashmanian*, 193 Conn. App. 171, 190, 219 A.3d 499 (2019). On appeal, the plaintiff contends that the Appellate Court incorrectly concluded that Kashmanian's actions during his surveillance of the plaintiff using a "soft car," which is an unmarked vehicle lacking police equipment, were discretionary acts for purposes of governmental immunity. We conclude that Kashmanian's operation of the soft car, including following the statutory rules of the road; see General Statutes § 14-212 et seq.; was a ministerial function and that the defendants, therefore, were not entitled to discretionary act immunity for Kashmanian's negligent operation of the soft car during the surveillance operation. Accordingly, we reverse in part the judgment of the Appellate Court.

The Appellate Court's opinion aptly sets forth the facts and procedural history in this case. "On June 1, 2013, at approximately 12 a.m., the plaintiff was riding his yellow Suzuki motorcycle on Asylum Avenue in Hartford with a group of eight to ten other people who were riding 'dirt bikes' and 'quads.' The plaintiff's motorcycle was neither 'street legal' nor 'roadworthy' because it did not have headlights and was equipped with off-road tires: a black tire on the front and a yellow tire on the back. Also at that time, Kashmanian was operating an unmarked gray Acura TL, which the police characterize as a 'soft car.' A soft car is a vehicle that is not equipped with flashing or revolving lights, sirens, or police markings so that it is indiscernible from ordinary civilian cars.

"At or around that same time, a confidential informant provided an anonymous tip to the police that a man riding a yellow motorcycle with a yellow tire had a gun. Kashmanian was instructed by other officers to perform surveillance[3] [of] the group of motorcycles and quads, including the yellow motorcycle, which was operated by the plaintiff. When Kashmanian arrived at Asylum Avenue, he observed the yellow motorcycle and the group of motorcycles and quads, and proceeded to follow them westbound on Asylum Avenue. All of the motorcycles and quads then turned right and proceeded

northbound on Sumner Street, which is a two lane road with a speed limit of twenty-five miles per hour. At the intersection of Asylum and Sumner, Kashmanian's vehicle 'sideswip[ed]' another motor vehicle . . . [that] had been proceeding in the same direction. Kashmanian paused for a brief second, but he was directed by the police on the radio to 'just keep going' and that they would 'take care of the accident; just keep going.'

"Kashmanian then proceeded north in the northbound lane of Sumner Street, to continue to surveil the plaintiff. Kashmanian was traveling between forty and fifty miles per hour, well over the twenty-five miles per hour speed limit. Kashmanian then crossed the center line to travel north in the southbound lane in an effort to avoid two quads in the group that fishtailed and sideswiped his vehicle. Although he could have returned to the northbound lane of traffic after passing the two quads, Kashmanian continued to travel north in the southbound lane, closing the distance between his car and the plaintiff's motorcycle until he struck the back tire of the plaintiff's motorcycle with the front left panel of his vehicle, which caused the plaintiff to crash his motorcycle into a parked car in the southbound lane of Sumner Street. The plaintiff was ejected from his motorcycle and landed approximately ninety-five feet down Sumner Street, causing him [to sustain serious] injuries. As evinced by the lack of skid marks on Sumner Street, Kashmanian neither suddenly slowed his vehicle nor applied his brakes before striking the plaintiff's motorcycle.

"On February 26, 2015, the plaintiff filed this personal injury action against the defendants. The plaintiff's operative fifth amended complaint contains two relevant counts.[4] In count one, the plaintiff asserted a common-law negligence claim against Kashmanian in his official capacity and the city, alleging that Kashmanian negligently caused the plaintiff's injuries. In count two, the plaintiff asserted a common-law recklessness claim against Kashmanian, alleging that he recklessly, wilfully, and wantonly caused the plaintiff's injuries.

"In response, the defendants filed answers denying the essential allegations of the plaintiff's complaint and alleging two relevant special defenses. The defendants alleged that the plaintiff's injuries were caused by his own comparative negligence, and that the plaintiff's claims are barred by common-law and statutory governmental immunity, pursuant to . . . § 52-557n, because Kashmanian was engaged in discretionary acts.[5] Prior to the submission of the case to the jury, the parties stipulated that the issue of whether the defendants were entitled to governmental immunity would be decided by the court if the jury returned a verdict in favor of the plaintiff on his negligence claim.

"The case was tried to a jury over the course of five days. At the close of evidence, [counsel for] Kashmanian

made an oral motion for a directed verdict as to count two, the common-law recklessness count. In particular, [he] argued that count two should not be submitted to the jury because there was no evidence that Kashmanian engaged in reckless conduct. After hearing the plaintiff's counterargument, the court orally granted Kashmanian's motion for a directed verdict as to count two. Accordingly, the jury was charged, and the case was submitted to the jury only as to count one, the negligence count, and the defendants' comparative negligence special defense. On that same day, the jury returned a verdict for the plaintiff in the total amount of $416,214, reduced on the basis of the jury's finding that the plaintiff comparatively was 25 percent negligent, for a net award of $312,160.50." (Footnote omitted; footnotes in original.) *Daley* v. *Kashmanian*, supra, 193 Conn. App. 173–77.

Following the submission of memoranda of law and oral arguments on the reserved issue of governmental immunity, the trial court "set aside the jury's verdict in favor of the plaintiff on count one, the negligence claim. In particular, the [trial] court concluded that governmental immunity was applicable to Kashmanian's conduct because his driving surveillance involved discretionary police activity, which is protected under § 52-557n (a) (2) (B). Because of its determination on governmental immunity, the court also reasoned that no cognizable claim existed against the city for indemnification under [General Statutes] § 7-465.[6] See [footnote 4] of this opinion. The court then rendered judgment in favor of the defendants on counts one and four of the plaintiff's complaint." (Footnote added.) *Daley* v. *Kashmanian*, supra, 193 Conn. App. 177–78.

The plaintiff appealed from the judgment of the trial court to the Appellate Court. After first agreeing with the plaintiff's claim that the trial court had improperly granted the defendants' motion for a directed verdict on count two of the complaint alleging recklessness; see id., 181–82; the Appellate Court then concluded that the trial court had properly granted the defendants' motion to set aside the verdict on the ground that the plaintiff's negligence claims were barred by governmental immunity. See id., 185–86. The Appellate Court reasoned that Kashmanian was engaged in discretionary conduct while surveilling the plaintiff, which is one of the "typical functions of a police officer." (Internal quotation marks omitted.) Id., 186. The court emphasized that "Kashmanian's surveillance, performed in the course of his employment as a police officer, necessarily required him to exercise his judgment, under the circumstances; for example, as to how fast to travel, the distance to maintain between his car and the [plaintiff's motorcycle], and whether to change lanes." Id., 187.

In so concluding, the Appellate Court rejected the plaintiff's argument that "Kashmanian had a ministerial

duty to comply with the motor vehicle statutes" while "operating a soft car with no lights or sirens" insofar as "the legislature has identified specific circumstances in [General Statutes] § 14-283[7] in which [the] police may disregard certain motor vehicle statutes," which means that, "absent those circumstances, police have a ministerial duty to obey all traffic laws." (Footnote added; internal quotation marks omitted.) Id. The Appellate Court reasoned that "[§] 14-283 addresses only two situations: responses to emergency calls and pursuit of fleeing law violators. It does not purport to set a standard of conduct for other police endeavors, including surveillance. Furthermore, the plaintiff's argument would make effective police surveillance impossible in many instances." (Footnote omitted.) Id., 187–88. Thus, the Appellate Court concluded that "the discretionary police activity of surveilling the plaintiff" afforded Kashmanian discretion that "extend[ed] to whether to violate the motor vehicle statutes."[8] Id., 189. Accordingly, the Appellate Court rendered judgment affirming the trial court's "judgment setting aside the jury's verdict on the negligence count" and reversing "the judgment directing a verdict in favor of Kashmanian on the common-law recklessness count," and remanded the case to the trial court "for a new trial as to [the recklessness] count." Id., 190. This certified appeal followed.[9] See footnote 2 of this opinion.

On appeal, the plaintiff, supported by the amici curiae, claims that the Appellate Court incorrectly concluded that the defendants were entitled to discretionary act immunity. Relying heavily on our recent decisions in *Cole* v. *New Haven*, 337 Conn. 326, 253 A.3d 476 (2020), and *Borelli* v. *Renaldi*, 336 Conn. 1, 243 A.3d 1064 (2020), the plaintiff argues that Kashmanian's "manner of driving" the soft car violated his ministerial duties as prescribed by the motor vehicle statutes, in particular General Statutes (Rev. to 2013) § 14-230,[10] which requires drivers to drive on the right side of the road, and without benefit of the exceptions provided by the emergency vehicle statute, § 14-283, which is limited to emergency responses and pursuits. Citing sister state cases and the "great weight of decisions in the Superior Court [concluding] that a police officer driving a motor vehicle is [engaged in a] ministerial activity," the plaintiff contends, inter alia, that adopting a "broader exception for police activities," such as that embraced by the Appellate Court in this case, "would render this carefully crafted [emergency vehicle] statute a nullity and usurp the General Assembly's authority to balance the important public values of effective policing and traffic safety."

In response, the defendants cite *Cole* v. *New Haven*, supra, 337 Conn. 326, *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019), and *Edgerton* v. *Clinton*, 311 Conn. 217, 86 A.3d 437 (2014), among other cases, and contend that the Appellate Court correctly concluded that dis-

cretionary act immunity extends to surveillance, which they claim is a "typical on-duty law enforcement activit[y]" not amenable to judicial second-guessing. Kashmanian in particular relies on several federal court decisions for the proposition that surveillance is a discretionary activity, with the exigencies of law enforcement reasonably taking precedence at times over compliance with traffic laws. See *State Farm Mutual Automobile Ins. Co.* v. *United States*, Docket No. 16-CV-897 (JNE/BRT), 2017 U.S. Dist. LEXIS 62132 (D. Minn. April 6, 2017); *Priah* v. *United States*, 590 F. Supp. 2d 920 (N.D. Ohio 2008); *Flax* v. *United States*, 847 F. Supp. 1183 (D.N.J. 1994). The defendants argue that the motor vehicle statutes on which the plaintiff relies did not create a ministerial duty because they did not require Kashmanian to conduct surveillance in any particular manner and that the emergency vehicle statute, § 14-283, is inapplicable because it is limited to pursuits and emergency responses, rather than "typical patrol or surveillance activities," such as that presented in this case.[11] The defendants further contend that the motor vehicle statutes themselves impart a component of discretion insofar as they require "reasonable" conduct in controlling the motor vehicle, including its speed, and keeping a lookout, with even § 14-230 and General Statutes (Rev. to 2013) § 14-240,[12] the latter of which governs following distances, providing for exceptions such as avoiding obstacles. We agree with the plaintiff, however, and conclude that the defendants were not entitled to governmental immunity because the motor vehicle statutes providing the rules of the road imposed numerous ministerial duties that Kashmanian violated in his operation of the soft car.

We begin with the standard of review. As the Appellate Court aptly stated, "[a]lthough generally a court's decision to set aside a jury verdict is subject to an abuse of discretion review . . . we afford plenary review to the present claim because, as the parties properly recognize, the ultimate determination as to whether the defendants are entitled to governmental immunity is a question of law." (Citation omitted.) *Daley* v. *Kashmanian*, supra, 193 Conn. App. 182; see, e.g., *Viking Construction, Inc.* v. *TMP Construction Group, LLC*, 338 Conn. 361, 368, 258 A.3d 80 (2021); *Ventura* v. *East Haven*, supra, 330 Conn. 634–37. Further, to the extent this appeal requires us to consider the meaning of § 52-557n itself, including whether the legislature contemplated that municipalities would be immune from liability for vehicular negligence pursuant to that statute, that inquiry presents a question of statutory interpretation governed by General Statutes § 1-2z. See, e.g., *Grady* v. *Somers*, 294 Conn. 324, 332–33, 984 A.2d 684 (2009); *Considine* v. *Waterbury*, 279 Conn. 830, 836–37, 905 A.2d 70 (2006).

"The following principles of governmental immunity are pertinent to our resolution of the plaintiff's claims.

The [common-law] doctrines that determine the tort liability of municipal employees are well established. . . . Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts. . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [a ministerial act] refers to a duty [that] is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"The tort liability of a municipality has been codified in § 52-557n. Section 52-557n (a) (1) provides that [e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . Section 52-557n (a) (2) (B) extends, however, the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that they will not be liable for damages caused by negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law. . . .

"For purposes of determining whether a duty is discretionary or ministerial, this court has recognized that [t]here is a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions. . . . A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of

the act being done. . . . In contrast, when an official has a general duty to perform a certain act, but there is no city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner, the duty is deemed discretionary. . . .

"In accordance with these principles, our courts consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion. . . . Because the construction of any such provision, including a municipal rule or regulation, presents a question of law for the court . . . whether the provision creates a ministerial duty gives rise to a legal issue subject to plenary review on appeal. . . .

"Because this appeal concerns the actions of police officers and the [city] police department, we also observe that [i]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality. . . . Indeed, this court has long recognized that it is not in the public's interest to [allow] a jury of lay[persons] with the benefit of 20/20 hindsight to second-guess the exercise of a [police officer's] discretionary professional duty. Such discretion is no discretion at all. . . . Thus, as a general rule, [p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer." (Internal quotation marks omitted.) *Cole* v. *New Haven*, supra, 337 Conn. 336–39; see, e.g., *Doe* v. *Madison*, 340 Conn. 1, 18–20, 31–32, 262 A.3d 752 (2021); *Borelli* v. *Renaldi*, supra, 336 Conn. 10–13; see also *Coley* v. *Hartford*, 312 Conn. 150, 164–65, 95 A.3d 480 (2014) (noting, with respect to officers' "alleged failure to adhere to specific police response procedures . . . the considerable discretion inherent in law enforcement's response to an infinite array of situations implicating public safety on a daily basis"); *Shore* v. *Stonington*, 187 Conn. 147, 153–57, 444 A.2d 1379 (1982) (whether to detain suspected drunk driver was discretionary act for police officer).

This appeal raises the question, which we left unanswered in our recent decisions in *Cole* v. *New Haven*, supra, 337 Conn. 347 n.18, and *Borelli* v. *Renaldi*, supra, 336 Conn. 4–5, of the extent to which the manner in which a police officer operates a motor vehicle while on duty is entitled to governmental immunity and, specifically, whether the motor vehicle statutes impose ministerial obligations on municipal employees such as police officers who drive during the course of their

employment—particularly during circumstances that are beyond the scope of the emergency vehicle statute, § 14-283.[13] In answering this question, we are mindful that § 52-557n, which the legislature enacted in 1986 as part of Tort Reform I; see Public Acts 1986, No. 86-338, § 13; is in large part a codification and harmonization of our case law governing the liability and immunity of municipalities. This renders critical to our analysis the legislature's understanding of the scope of municipal liability and immunity, both directly under the terms of § 52-557n and indirectly via the indemnification statutes, particularly § 7-465.[14] See *Grady* v. *Somers*, supra, 294 Conn. 348 (considering "the close relationship between § 52-557n (a) and the common-law doctrines governing municipal employees' immunity and liability for indemnification purposes under § 7-465 (a)" in concluding that "the identifiable person, imminent harm common-law exception to municipal employees' qualified immunity also applies in an action brought directly against municipalities pursuant to § 52-557n (a) (1) (A), regardless of whether an employee or officer of the municipality also is a named defendant"); *Violano* v. *Fernandez*, 280 Conn. 310, 326–28, 907 A.2d 1188 (2006) (relying on legislature's codification of discretionary act immunity in § 52-557n (a) (2) (B) in rejecting request to change definition of ministerial task to "follow the distinction used by other states under which governmental immunity would apply to acts that are related to policy decisions and, conversely, immunity would not apply to acts that implement policy").

Because the legislature intended § 52-557n to harmonize our state's law of municipal liability, we focus first on the statute. The text of § 52-557n (a) provides in relevant part that a municipality "shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of such [municipality] or any employee, officer or agent thereof acting within the scope of his employment or official duties"; General Statutes § 52-557n (a) (1) (A); which presumably would include vehicular negligence, but then limits that liability by providing that the municipality "shall not be liable for damages to person or property caused by . . . *negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.*" (Emphasis added.) General Statutes § 52-557n (a) (2) (B). The tension between these provisions is heightened by the statute's silence as to whether driving is a discretionary act for purposes of § 52-557n (a) (2) (B). Given the ambiguity that this particular silence creates, under § 1-2z, we turn to extratextual sources, in particular the legislative history of the statute.

The legislative history of the statute, although less than definitive in other contexts,[15] establishes the legislature's understanding of the effect of the Tort Reform I bill enacted as § 52-557n on municipalities' liability

for vehicular negligence. Most instructive are the remarks of Representative Robert G. Jaekle, the bill's sponsor, in response to "an unsuccessful amendment that would have deleted the portion of the bill enacted as § 52-557n . . . on the ground that it was too restrictive with respect to its limitations on claimants' rights," in which he answered "numerous questions about municipalities' potential liability under a variety of fact patterns, some hypothetical, and some actual cases." *Grady* v. *Somers*, supra, 294 Conn. 344. Several of Representative Jaekle's answers expressly contemplated vehicular negligence in the performance of governmental tasks as a basis for municipal liability. In one instance, Representative Jaekle responded to a question posed by Representative Gabriel J. Biafore, opining that the bill would have imposed no limitation on the liability of the city of Bridgeport when one of its snowplows struck a student who was present in the parking lot and schoolyard of a city school that was closed during a snowstorm. See 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5903–5904; see also id., pp. 5899–5901, remarks of Representative Jaekle (opining that municipality would not be immune for injuries caused by school bus crash involving "some negligence"). In another exchange with Representative Eugene A. Migliaro, Jr., concerning a hypothetical case of a fatal accident caused by a town employee who was intoxicated when he drove a town truck while on-duty, Representative Jaekle agreed with Representative Migliaro that the bill would permit both the employee and the town to be held liable, regardless of whether the employee's supervisor was aware of his intoxication. See id., pp. 5932–34. Representative Migliaro then stated that Representative Jaekle's explanation had "clarified" his understanding of the bill that, "as far as the employees are concerned, that the town, as long as they work for the town, the town can still be held responsible for the actions of [its] employees." Id., pp. 5936–37. This legislative history suggests, therefore, that the legislature contemplated negligence in the operation of motor vehicles not to be subject to governmental immunity, both before and after the passage of § 52-557n.

Indeed, the legislature's understanding of the liability of individual police officers—and of the municipalities that employ them pursuant to § 7-465[16]—for the negligent operation of motor vehicles during law enforcement operations is implicitly confirmed by this court's nearly contemporaneous decision in *Tetro* v. *Stratford*, 189 Conn. 601, 611, 458 A.2d 5 (1983), which rejected a claim of "blanket immunity" under § 14-283 for damages arising from a crash caused by a high-speed police pursuit. This is particularly so given that we presume that the legislature is aware of the common law on a particular subject and, further, that it knows how to abrogate common-law rules, as it deems appropriate. See, e.g., *Pacific Ins. Co., Ltd.* v. *Champion Steel, LLC*, 323 Conn.

254, 265, 146 A.3d 975 (2016). In *Tetro*, the defendant town of Stratford was held liable pursuant to § 7-465 to indemnify two of its police officers for their negligence in conducting a high-speed pursuit on highly trafficked local roadways, which resulted in the pursued vehicle's crashing into the plaintiff's car. See *Tetro* v. *Stratford*, supra, 602–603 and n.1. Citing the due regard language of § 14-283 (d); see footnote 7 of this opinion; this court rejected the defendants' argument that there was "immunity conferred, as a matter of public policy, [on] emergency vehicles in pursuit of law violators." Id., 604–605; see id., 609. The court emphasized "that § 14-283 provides no special zone of limited liability once the defendants' negligence has been established." Id., 610; see id., 611 (stating in dictum that, "[a]s a general proposition, our common law and our statutes do not confer [on] police officers, whose conduct is negligent, blanket immunity from liability to an innocent bystander by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior"). As Justice Ecker observed in his dissenting opinion in *Borelli*, it is telling that "we have a unanimous precedent, decided shortly before the enactment of § 52-557n, holding that a municipality is liable for its employee's negligent operation of an emergency vehicle engaged in a police pursuit. . . . The legislature thereafter codified the then-existing common law governing municipal liability without so much as a whisper of any intention to impact, modify, or even address the law of vehicular negligence in general or the holding of *Tetro* in particular." (Citation omitted.) *Borelli* v. *Renaldi*, supra, 336 Conn. 138 (*Ecker, J.*, dissenting); see also id., 45–46 (*Robinson, C. J.*, concurring) (describing *Tetro* as having "limited" precedential value with respect to specific issue in *Borelli*, namely, whether decision to pursue vehicle for minor equipment violation was discretionary act, but agreeing with dissent that *Tetro* held that § 14-283 does not provide any immunity for operation of police vehicle during pursuit or emergency situation).

Although the legislative history of § 52-557n demonstrates the legislature's understanding that the negligent operation of motor vehicles is not shielded by governmental immunity, the legislative history provides no clarity as to the specific doctrinal basis for that understanding. In the absence of any indication in the text or legislative history of § 52-557n that the legislature intended to alter or abolish the existing liability regime under the common law and related indemnification statutes, which imposed liability on municipalities for damages caused by the negligent operation of motor vehicles driven by municipal employees, we conclude that the legislature understood the operation of a motor vehicle to be a ministerial act.[17] This is consistent with the fact that the operation of a motor vehicle is a highly regulated activity governed by a panoply of state motor

vehicle statutes establishing the rules of the road for all drivers as expressly provided. A review of this statutory scheme is instructive because it demonstrates that the terms of the relevant motor vehicle laws establish a ministerial duty insofar as they contain "mandatory statutory language" that "*itself* limits discretion in the performance of the mandatory act." (Emphasis in original.) *Northrup* v. *Witkowski*, 332 Conn. 158, 187, 210 A.3d 29 (2019). Accordingly we now turn specifically to the rules of the road that are at issue in this case, as pleaded in the operative complaint, which require vehicles to be driven to the right, govern following distances, and prohibit driving at an unreasonable rate of speed. See General Statutes (Rev. to 2013) §§ 14-218a, 14-230 and 14-240.

We begin with § 14-230, which uses definitive language in requiring vehicles to be driven to the right. It provides in relevant part: "Upon all highways, *each vehicle . . . shall be driven upon the right*, except (1) when overtaking and passing another vehicle proceeding in the same direction, (2) when overtaking and passing pedestrians, parked vehicles, animals or obstructions on the right side of the highway, (3) when the right side of a highway is closed to traffic while under construction or repair, (4) on a highway divided into three or more marked lanes for traffic, or (5) on a highway designated and signposted for one-way traffic."[18] (Emphasis added.) General Statutes (Rev. to 2013) § 14-230 (a). Thus, § 14-230 requires drivers to drive their vehicles to the right, with no room for deviation beyond the five delineated exceptions.

In contrast to § 14-230, the two other motor vehicle statutes pleaded in the operative complaint employ *some* language of "reasonableness" that we have long held is the hallmark of a discretionary act; see, e.g., *Coley* v. *Hartford*, supra, 312 Conn. 165–66; to define the duty of the motor vehicle operator to proceed safely. Those statutes then narrow the judgment permitted in a way that provides objective guideposts for the driver's decision making—and the subsequent evaluation thereof.[19] For example, § 14-218a, which governs speeds on local roadways such as Hartford's Sumner Street and Asylum Avenue, which are at issue in this case, provides in relevant part that "[n]o person shall operate a motor vehicle upon any public highway of the state, or road of any specially chartered municipal association . . . *at a rate of speed greater than is reasonable*, having regard to the width, traffic and use of highway, road or parking area, the intersection of streets and weather conditions," but then channels that discretion by providing that "[a]ny speed in excess of such limits, other than speeding as provided for in section 14-219, *shall be prima facie evidence that such speed is not reasonable*, but the fact that the speed of a vehicle is lower than such limits shall not relieve the operator from the duty to decrease speed when a special hazard exists

with respect to pedestrians or other traffic or by reason of weather or highway conditions." (Emphasis added.) General Statutes (Rev. to 2013) § 14-218a (a). Similarly, § 14-240 (a), which governs following distances, provides: "No driver of a motor vehicle shall follow another vehicle more closely *than is reasonable and prudent*, having regard for the speed of such vehicles, the traffic upon and the condition of the highway and weather conditions."[20] (Emphasis added.) General Statutes (Rev. to 2013) § 14-240 (a).

Other relevant aspects of the motor vehicle statutory scheme leave us hard-pressed to describe the obligations that the rules of the road impose as so open-ended in their execution as to constitute a discretionary act for purposes of governmental immunity. In particular, § 14-283, the emergency vehicle statute, is indicative of the lack of discretion that the rest of the statutory scheme provides to operators of motor vehicles. Section 14-283 provides the operators of emergency vehicles relief in certain discrete circumstances—such as the response to an emergency or the police pursuit of a fleeing law violator—from what ordinarily would be negligence per se, namely, the operation of a motor vehicle in violation of rules of the road such as speed limits and traffic control devices.[21] See *Tetro* v. *Stratford*, supra, 189 Conn. 609. Subsection (d) of § 14-283 emphasizes, however, that the "emergency vehicle legislation provides only limited shelter from liability for negligence. The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules. The statute does not relieve operators of emergency vehicles from their general duty to exercise due care for the safety of others." Id. Although the extent to which governmental immunity is applicable to the operation of an emergency vehicle under the privileges accorded by § 14-283 remains an open question in the wake of our decision in *Borelli* v. *Renaldi*, supra, 336 Conn. 1,[22] the motor vehicle statutory scheme establishes that— in the absence of the limited shelter of § 14-283—it imposes a ministerial duty on a government employee, including an on-duty police officer, who is operating a motor vehicle.[23]

The fact that the violation of these rules—beyond the emergency operation shelter of § 14-283—is punishable quasi-criminally as an infraction further suggests that the statutory rules of the road create a ministerial obligation. See *State* v. *Nesteriak*, 60 Conn. App. 647, 652– 54, 760 A.2d 984 (2000) (concluding that § 14-283 (b) provides emergency vehicle operator with immunity from criminal prosecution for violation of traffic laws, including improper passing in violation of General Statutes § 14-232 and improper driving on left side of highway on curve in violation of General Statutes § 14-235, which is not overridden by "due care" requirement of subsection (d)); *State* v. *Plaskonka*, 22 Conn. App. 207,

209, 577 A.2d 729 ("the state had the burden of proving every element of the infractions beyond a reasonable doubt"), cert. denied, 216 Conn. 812, 580 A.2d 65 (1990); see also General Statutes § 51-164n (h) ("[i]n any trial for the alleged commission of an infraction, the practice, procedure, rules of evidence and burden of proof applicable in criminal proceedings shall apply"); *State* v. *Scribner*, 72 Conn. App. 736, 741–42, 805 A.2d 812 (2002) (emergency vehicle operator's privilege under § 14-283 does not provide immunity from negligent homicide with motor vehicle under General Statutes § 14-222a because that statute's terms indicate that "the legislature did not intend to put the limitation of liability offered under § 14-283 above the safety of the public"). These statutes, therefore, do not call for the kind of open-ended good professional judgment that is the hallmark of discretionary act immunity. Cf. *Coley* v. *Hartford*, supra, 312 Conn. 165–66 (police department response procedure requiring officer to remain at scene of domestic disturbance "for a reasonable time" period, as determined by "the reasonable judgment of the officer," created discretionary duty for purposes of § 52-557n (a) (2) (B) (internal quotation marks omitted)).

It is also significant that, although there is no appellate authority on point, our trial courts uniformly have held that the operation of an emergency vehicle—at least beyond the scope of § 14-283, the emergency vehicle statute—is a ministerial function for purposes of governmental immunity.[24] Prior to the enactment of § 52-557n in 1986, "[n]o serious questions appeared to have been raised as to whether a police officer might be liable for negligence in the operation of a motor vehicle . . . [but, rather] the municipal employer would be responsible for indemnification of an officer found to have been civilly liable, under the provisions of . . . § 7-465 . . . ." *Torres* v. *Norwalk*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-CV-16-6029691-S (May 2, 2018) (66 Conn. L. Rptr. 548, 550);[25] see *Borelli* v. *Renaldi*, supra, 336 Conn. 119 (*Ecker, J.*, dissenting) ("[h]istorically speaking, ordinary negligence principles so plainly apply to municipal employees who drive motor vehicles on public roadways that the rubric of municipal immunity typically is not invoked at all in this context"). These courts describe driving as an act that "occurs subconsciously much of the time" but that also "is constantly guided by a vast array of statutes and regulations that prescribe the conduct that is proper and improper while on the road. Following the rules of [the] road and exercising due care to the public is not optional for municipal employees engaged in routine driving." *Williams* v. *New London*, Superior Court, judicial district of New London, Docket No. CV-12-6012328-S (April 7, 2014) (58 Conn. L. Rptr. 86, 89–90); see id., 88 ("[R]outine driving cannot be considered a purely discretionary function. That is because, for example, municipal employees cannot

claim that they have discretion to run stop signs, ignore pedestrians in the crosswalk, or exceed the speed limit while driving through city streets. These rules of the road are ministerial duties to which everyone must adhere, even police officers and firefighters when not responding to emergencies."); see also, e.g., *Torres* v. *Norwalk*, supra, 556 ("[v]iewed in isolation, the court must reject any suggestion that [nonemergency] operation of a motor vehicle, by a police officer, is a governmental function"); *Gagliardi* v. *Consiglio*, Superior Court, judicial district of New Haven, Docket No. CV-95-0380916 (September 16, 1997) (20 Conn. L. Rptr. 264, 266–67) (operation of school district truck in school parking lot was ministerial act); *Letowt* v. *Norwalk*, 41 Conn. Supp. 402, 406, 579 A.2d 601 (1989) ("[o]rdinary citizens drive their cars every day, not just police officers, and hence the operation of a motor vehicle would be deemed ministerial").

Significantly, these Superior Court decisions distinguish between the act of driving the motor vehicle, which is ministerial in nature, and the task that the employee sought to accomplish by driving the motor vehicle, which might well be discretionary, in concluding that governmental immunity does not bar claims of vehicular negligence. Most instructive is *MacMillen* v. *Branford*, Superior Court, judicial district of New Haven, Docket No. 374004 (March 30, 1998) (21 Conn. L. Rptr. 561), in which the court rejected a claim that a police officer who crashed his cruiser while in the course of investigating reported discharges of illegal fireworks was engaged in a discretionary act; the court drew a sharp distinction between the acts of driving and investigation. See id., 561–62; see also *Pelletier* v. *Petruck*, Superior Court, judicial district of Hartford, Docket No. CV-07-5009064-S (September 10, 2008) (46 Conn. L. Rptr. 288, 289) (denying motion for summary judgment in case arising from collision with snowplow because "the plaintiff does not allege that she was injured as a result of the construction or maintenance of the highways, but rather that her damages were the result of [the town employee's] alleged negligent operation of a motor vehicle"); *Letowt* v. *Norwalk*, supra, 41 Conn. Supp. 406 (contrasting act of driving police car to accident scene from duties officer performed once there, such as measuring skid marks or caring for injured person).

The decisions of our sister states similarly support the conclusion that driving a motor vehicle in a nonemergency situation is a ministerial act for purposes of governmental immunity. See, e.g., *Loxley* v. *Coleman*, 720 So. 2d 907, 909 (Ala. 1998) (observing that "trying to avoid potholes while driving a motor vehicle is a ministerial, and not a discretionary, function" in concluding that supervisor was not entitled to governmental immunity for injuries caused when inmate fell from back of truck she was driving); *Wakarusa* v. *Holdeman*,

582 N.E.2d 802, 803–804 (Ind. 1991) (concluding that police officer involved in rear-end collision while on patrol looking for license plate violations was not engaged in "law enforcement" activities for purposes of governmental immunity statute, rendering "the controlling question" whether officer breached his duty to operate vehicle with reasonable care on public roadway); *Kyllo* v. *Panzer*, 535 N.W.2d 896, 903 (S.D. 1995) ("[i]t is inconceivable that driving a motor vehicle is anything other than a ministerial function"); *Hulick* v. *Houston*, Docket No. 14-20-00424-CV, 2022 WL 288096, *4–5 (Tex. App. February 1, 2022, pet. review filed) (officer driving cruiser during search for homeless person who allegedly caused disturbance was engaged in ministerial act and, therefore, was not entitled to governmental immunity for collision); *Heider* v. *Clemons*, 241 Va. 143, 145, 400 S.E.2d 190 (1991) ("[although] every person driving a car must make myriad decisions, in ordinary driving situations the duty of due care is a ministerial obligation"); *Morway* v. *Trombly*, 173 Vt. 266, 273, 789 A.2d 965 (2001) (operation of snowplow is ministerial act); see also 4 Restatement (Second), Torts § 895D, comment (h), p. 418 (1979) (noting that "the driving of vehicles" is example of ministerial act "under ordinary circumstances" as one "done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done"). Accordingly, the decisions of our sister states lend further support to the proposition that driving is a ministerial act for purposes of governmental immunity.[26]

We therefore conclude that, because the operation of a motor vehicle is a highly regulated activity that constitutes a ministerial function, Kashmanian's operation of the soft car was not itself a discretionary activity during the surveillance operation that led to the collision that injured the plaintiff. The decision of Kashmanian and his fellow officers to use the soft car to surveil the plaintiff was indeed a discretionary one. See, e.g., *Priah* v. *United States*, supra, 590 F. Supp. 2d 922–23, 928–29 (there was no liability under Federal Tort Claims Act because federal agents were engaged in discretionary act in attempting to rescue kidnapped confidential informant via SWAT team raid, which led to death of informant when agents fired on vehicle in self-defense); *Flax* v. *United States*, supra, 847 F. Supp. 1190–91 (there was no liability under Federal Tort Claims Act because federal agents were engaged in discretionary act in deciding to engage in further surveillance of kidnapper in hopes of locating accomplice and victim, which was unsuccessful, rather than to apprehend kidnapper immediately after ransom pickup). But see *State Farm Mutual Automobile Ins. Co.* v. *United States*, supra, 2017 U.S. Dist. LEXIS 62132, *9 (vehicle surveillance without use of warning devices when proceeding against

red light was expressly discretionary act under terms of Federal Bureau of Investigation's ground surveillance policy, which recognized that, "under certain conditions, the rules of the road give way to the exigencies of surveillance"); cf. *Borelli* v. *Renaldi*, supra, 336 Conn. 14–15 (decision to pursue is discretionary). Nevertheless, once the officers decided to operate a motor vehicle on public streets for the surveillance operation, they were legally bound to comply with the statutory rules of the road unless they were operating as an emergency vehicle within the meaning of § 14-283, which they concede was not the case under the present circumstances because § 14-283 is expressly limited to pursuits and emergency call responses, neither of which is a scenario presented in this case. Accordingly, Kashmanian's operation of the soft car was a ministerial act for purposes of his governmental immunity and that of the city pursuant to § 52-557n.

We disagree with the defendants' argument, echoed in the Appellate Court's opinion in this case; see *Daley* v. *Kashmanian*, supra, 193 Conn. App. 188–89; that a conclusion that our motor vehicle statutes create a ministerial duty frustrates public policy by cramping police officers' discretion while undertaking their surveillance function, which is not covered by § 14-283. We recently rejected a similar argument in *Cole*, which concerned the highly regulated area of police pursuits, observing: "Although our case law repeatedly emphasizes the broad discretion generally afforded to police officers in the performance of their duties . . . the . . . arguments in the present case verge on ask[ing] too much in urging us to conclude that *all* police conduct in emergency situations is discretionary. We do not read our previous cases as establishing the broad proposition that *all* police conduct in emergencies is discretionary, even in the face of binding police department policies." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Cole* v. *New Haven*, supra, 337 Conn. 347. It is beyond our purview to extend an advantage to law enforcement by extending the limited relief from compliance with the traffic laws provided by § 14-283 to surveillance operations. As with pursuits, which are regulated comprehensively by General Statutes § 14-283a, the complex balancing of public safety against the exigencies of law enforcement is a public policy question for the legislature.[27] See, e.g., *Mayer* v. *Historic District Commission*, 325 Conn. 765, 780 and n.10, 160 A.3d 333 (2017); *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 549–50, 93 A.3d 1142 (2014).

The judgment of the Appellate Court is reversed insofar as that court upheld the trial court's motion to set aside the jury's verdict on count one of the operative complaint alleging negligence on the part of Kashmanian, and the case is remanded to the Appellate Court with direction to reverse that part of the trial court's

judgment in favor of Kashmanian on count one and in favor of the city on count four of the operative complaint seeking indemnification from the city pursuant to § 7-465 for Kashmanian's negligence, to reinstate the jury's verdict, and to render judgment for the plaintiff on count four of the operative complaint; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] General Statutes § 52-557n (a) provides: "(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) *The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties*; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit; and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance; provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149. (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) *negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law*." (Emphasis added.)

[2] We granted the plaintiff's petition for certification, limited to the following issue: "Did the Appellate Court correctly determine that . . . § 52-557n confers governmental immunity from liability for damages arising from personal injuries caused by a police officer's negligent operation of a motor vehicle when the negligent conduct occurs in the course of the officer's [on-duty] surveillance activities?" *Daley* v. *Kashmanian*, 335 Conn. 939, 237 A.3d 1 (2020).

Upon review of the briefs and record in this certified appeal, we observe that the immunity issues decided by the Appellate Court concern both an individual employee and his municipal employer. Accordingly, we rephrase the certified question to reflect that the discretionary act immunity at issue in this case has its doctrinal origins both at common law, for the employee, and under § 52-557n (a) (2) (B), for the municipality. See, e.g., *State* v. *Raynor*, 334 Conn. 264, 266 n.1, 221 A.3d 401 (2019) (this court may "rephrase" certified question that "does not properly frame the issues presented in the appeal because it inaccurately reflects the holding of the Appellate Court" (internal quotation marks omitted)); see also *Cole* v. *New Haven*, 337 Conn. 326, 336–37, 253 A.3d 476 (2020) (explaining doctrinal sources of discretionary act immunity).

[3] "Kashmanian testified that his understanding of surveillance is 'you're following someone at a distance, trying to keep an eye on them, where they're going; what their actions are. It could be in a car; it can be walking. It could be anywhere. It could be through a camera.' " *Daley* v. *Kashmanian*, supra, 193 Conn. App. 174 n.1.

[4] "The complaint contains two additional counts . . . . In count three, the plaintiff alleged a statutory recklessness claim pursuant to General Statutes § 14-295 against Kashmanian in his individual capacity. The plaintiff withdrew this count at the conclusion of the presentation of evidence at trial. In count four, the plaintiff alleged an indemnification claim against the city pursuant to General Statutes § 7-465 (providing indemnification by municipalities of municipal officers, agents or employees who incur liability for negligent official conduct). Count four was not submitted to the jury because resolution of that claim was dependent on the court's analysis of the defendants' governmental immunity special defense. Specifically, in the absence of a common-law negligence claim against Kashmanian, there would be no basis for a statutory indemnification claim against the city pursuant to § 7-465. See *Wu* v. *Fairfield*, 204 Conn. 435, 438, 528 A.2d 364 (1987) ('in a suit under § 7-465, any municipal liability [that] may attach is predicated on prior findings of individual negligence on the part of the employee and the municipality's employment relationship with that individual')." *Daley* v. *Kashmanian*, supra, 193 Conn. App. 175 n.2.

[5] "The defendants pleaded governmental immunity as a special defense generally to all of the plaintiff's claims, yet Kashmanian [did] not argue that

governmental immunity would apply to his alleged[ly] wilful, wanton, or reckless conduct." *Daley* v. *Kashmanian*, supra, 193 Conn. App. 176 n.4.

[6] General Statutes § 7-465 provides in relevant part: "(a) Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality, except firemen covered under the provisions of section 7-308 . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as set forth in this section, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty. . . . Such municipality may arrange for and maintain appropriate insurance or may elect to act as a self-insurer to maintain such protection. . . . Governmental immunity shall not be a defense in any action brought under this section. . . ."

Although the legislature has amended § 7-465 since the events underlying the present case; see, e.g., Public Acts 2013, No. 13-247, § 273; these amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[7] General Statutes § 14-283 provides in relevant part: "(a) As used in this section, 'emergency vehicle' means . . . (3) any state or local police vehicle operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators . . . .

"(b) (1) The operator of any emergency vehicle may (A) park or stand such vehicle, irrespective of the provisions of this chapter, (B) except as provided in subdivision (2) of this subsection, proceed past any red light, stop signal or stop sign, but only after slowing down or stopping to the extent necessary for the safe operation of such vehicle, (C) exceed the posted speed limits or other speed limits imposed by or pursuant to section 14-218a 14-219, or section 7 of public act 21-28 as long as such operator does not endanger life or property by so doing, and (D) disregard statutes, ordinances or regulations governing direction of movement or turning in specific directions.

"(2) The operator of any emergency vehicle shall immediately bring such vehicle to a stop not less than ten feet from the front when approaching and not less than ten feet from the rear when overtaking or following any registered school bus on any highway or private road or in any parking area or on any school property when such school bus is displaying flashing red signal lights and such operator may then proceed as long as he or she does not endanger life or property by so doing.

"(c) The exemptions granted in this section shall apply only when an emergency vehicle is making use of an audible warning signal device, including but not limited to a siren, whistle or bell which meets the requirements of subsection (f) of section 14-80, and visible flashing or revolving lights which meet the requirements of sections 14-96p and 14-96q, and to any state or local police vehicle properly and lawfully making use of an audible warning signal device only.

"(d) The provisions of this section shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property. . . ."

Although § 14-283 has been amended by the legislature since the events underlying the present case; see, e.g., Public Acts 2014, No. 14-221, § 1; these amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[8] The Appellate Court, however, "decline[d] to hold that, *under all circumstances*, a municipal police officer operating a motor vehicle is engaged in discretionary conduct, thereby immunizing the officer and municipality from damages arising from all violations of motor vehicle statutes. Although it may be true that some motor vehicle statutes implicitly require drivers to exercise some degree of judgment when operating a motor vehicle, some statutes do not. Furthermore, although some circumstances may permit an officer, in the exercise of discretion, to violate a motor vehicle statute, that is not always the case. Affording governmental immunity in *every* instance [in which] an officer violates a motor vehicle statute is far too expansive a rule. For example, a police officer who fails to stop at a stop sign because he is distracted by a personal phone call and, as a result, causes an accident can hardly be said to be engaging in discretionary conduct. In such a circum-

stance, the officer likely has a ministerial duty to obey the law and [to] stop at the stop sign. Ultimately, the determination of whether a police officer who violates a motor vehicle statute is engaged in ministerial or discretionary conduct must be made in view of the language of the statute at issue and the circumstances presented." (Emphasis in original.) *Daley* v. *Kashmanian*, supra, 193 Conn. App. 188–89.

[9] We note that Kashmanian filed a cross petition for certification to appeal from the judgment of the Appellate Court reversing the judgment of the trial court, which had directed a verdict in favor of Kashmanian on the common-law recklessness count. We denied Kashmanian's cross petition for certification. See *Daley* v. *Kashmanian*, 335 Conn. 940, 237 A.3d 1 (2020).

[10] General Statutes (Rev. to 2013) § 14-230 provides in relevant part: "(a) Upon all highways, each vehicle . . . shall be driven upon the right, except (1) when overtaking and passing another vehicle proceeding in the same direction, (2) when overtaking and passing pedestrians, parked vehicles, animals or obstructions on the right side of the highway, (3) when the right side of a highway is closed to traffic while under construction or repair, (4) on a highway divided into three or more marked lanes for traffic, or (5) on a highway designated and signposted for one-way traffic.

"(b) Except as provided in subsection (c) of this section, any vehicle proceeding at less than the normal speed of traffic shall be driven in the right-hand lane available for traffic, or as close as practicable to the right-hand curb or edge of the highway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway.

* * *

"(d) Violation of any provision of this section shall be an infraction."

Hereinafter, unless otherwise indicated, all references to § 14-230 in this opinion are to the 2013 revision of the statute.

[11] At oral argument before this court, whether Kashmanian was engaged in a "pursuit" of the plaintiff using the soft car was a significant topic of discussion. Consistent with arguments raised in his brief positing that Kashmanian operated the soft car in a manner that was "equivalent to pursuit," the plaintiff argued that Kashmanian would have violated numerous ministerial duties under the pursuit statute, General Statutes § 14-283a, and § 14-283 when he "drove at nearly double the posted speed limit, drove on the left side of the road without justification, and accelerated to close the gap between his automobile and the plaintiff's motorcycle, until he was following too closely for safety, with nearly fatal consequences." For their part, the defendants argued that Kashmanian's actions did not constitute a "pursuit" as a matter of law. Given our resolution of the plaintiff's ministerial act arguments as based on the statutory rules of the road, we need not consider the parties' pursuit related arguments.

[12] General Statutes (Rev. to 2013) § 14-240 provides in relevant part: "(a) No driver of a motor vehicle shall follow another vehicle more closely than is reasonable and prudent, having regard for the speed of such vehicles, the traffic upon and the condition of the highway and weather conditions.

"(b) No person shall drive a vehicle in such proximity to another vehicle as to obstruct or impede traffic.

* * *

"(d) Violation of any of the provisions of this section shall be an infraction, provided any person operating a commercial vehicle combination in violation of any such provision shall have committed a violation and shall be fined not less than one hundred dollars nor more than one hundred fifty dollars."

Hereinafter, unless otherwise indicated, all references to § 14-240 in this opinion are to the 2013 revision of the statute.

[13] See footnote 22 of this opinion and accompanying text.

[14] "At common law, municipal officers were liable for their own torts, but the municipality, their municipal 'master,' was not vicariously liable for those torts. . . . Section 7-465 (a) effectively circumvented the general [common-law] immunity of municipalities from vicarious liability for their employees' acts by permitting injured plaintiffs to seek indemnification from a municipal employer for such acts under certain circumstances and after conformance with certain statutory requirements, but it did not bar a plaintiff from seeking redress from those employees." (Citations omitted.) *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 193, 592 A.2d 912 (1991); see, e.g., *Williams* v. *New Haven*, 243 Conn. 763, 767–68, 707 A.2d 1251 (1998) (discussing difference between action against municipality pursuant to § 52-557n, which "limit[s] governmental immunity in certain circumstances," and action against individual municipal employees or officials

accompanied by statutory indemnification claim against municipality).

[15] This court has observed that the legislative history of § 52-557n is not always helpful in interpreting the statute given confusion among legislators in both houses about "the municipal liability section of the [Tort Reform I bill] as either altering [an individual's] existing right to bring an action against a municipality, or, at the very least, as having an unclear impact on [an individual's] right to sue a municipality." *Considine* v. *Waterbury*, supra, 279 Conn. 839; see *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 188, 592 A.2d 912 (1991) (describing "the legislative history of § 52-557n [as] worse than murky").

[16] The indemnification statutes, such as § 7-465, are themselves also indicative of the legislature's understanding of the liability of individual employees for vehicular negligence and its effect on municipalities at the time of the enactment of § 52-557n. These statutes were "enacted to protect municipal employees, including police officers, from the financial consequences of common-law tort liability for damages caused by their on-duty, negligent operation of motor vehicles; concerns about liability arising from negligent driving in large measure account for the enactment of our municipal indemnification statutes." *Borelli* v. *Renaldi*, supra, 336 Conn. 119 (*Ecker, J.*, dissenting); see id., 87–95 (*Ecker, J.*, dissenting) (explaining history of indemnification statutes, which were intended to protect municipal employees from personal risk while averting "the manifest unfairness that inevitably resulted when the cost of a municipal employee's negligence was imposed on the victim of that negligence rather than the municipality"). "Our case law is clear . . . that when the legislature chooses to act, it is presumed to know how to draft legislation consistent with its intent and to know of all other existing statutes and the effect that its action or nonaction will have [on] any one of them." (Internal quotation marks omitted.) *King* v. *Volvo Excavators AB*, 333 Conn. 283, 296, 215 A.3d 149 (2019).

[17] Even if we were to assume, for the sake of argument, that driving is in the nature of a discretionary act, or is an activity that lies outside the ministerial/discretionary dichotomy altogether, we would conclude that the well established law imposing municipal liability for vehicular negligence at the time § 52-557n was enacted—a body of law that was known to the legislature, as the legislative history previously recounted in this opinion reflects—illustrates that "the legislature did not contemplate § 52-557n as a bar against *all* civil actions arising from employees' discretionary acts, despite the discretionary act immunity afforded by § 52-557n (a) (2) (B)." (Emphasis added.) *Grady* v. *Somers*, supra, 294 Conn. 345. *Grady* and other decisions of this court recognize that the savings clauses in § 52-557n (a), which provide that the terms of the statute govern "[e]xcept as otherwise provided by law," preserve and incorporate common-law exceptions to municipal immunity. See *Grady* v. *Somers*, supra, 345–49. We note that, in *Borelli*, two separate opinions by members of this court embraced the proposition that driving a motor vehicle, including while engaged in emergency operation under § 14-283 (d), is not subject to discretionary act immunity under § 52-557n (a) (2) (B), given that statute's savings clauses. See *Borelli* v. *Renaldi*, supra, 336 Conn. 39–40 and n.4 (*Robinson, C. J.*, concurring); id., 144 (*Ecker, J.*, dissenting). We emphasize, however, that the extent to which governmental immunity extends to the operation of a municipal vehicle in emergency mode under § 14-283 remains an open question, particularly because this appeal does not concern operation pursuant to the privileges conferred by the emergency vehicle statute. See footnote 22 of this opinion and accompanying text.

[18] For other motor vehicle statutes that use definitive wording, see General Statutes § 14-219 (establishing infraction of speeding on highways by reference to speed limits), and General Statutes § 14-239 (a) (noting that "streets and highways" may be designated as one-way streets and that, "[u]pon any highway so designated a vehicle shall be driven only in the direction indicated").

[19] Still other motor vehicle statutes use a mix of discretionary and definitive language across the operations governed by their subsections, such as General Statutes § 14-234, which governs passing in no-passing zones, and General Statutes §§ 14-241 and 14-242, which govern turning. Compare General Statutes § 14-234 (a) ("[w]hen [no passing] signs or markings are in place and clearly visible to an ordinarily observant person, each driver of a vehicle shall obey the directions thereof"), General Statutes § 14-241 (b) ("[a]t any intersection where traffic is permitted to move in both directions on each highway entering the intersection, an approach for a left turn shall be made in that portion of the right half of the highway nearest the center line thereof

and by passing to the right of such center line where it enters the intersection, and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the highway being entered"), General Statutes § 14-241 (e) ("when rotaries or roundabouts, signs or other devices are so placed, no driver shall turn a vehicle otherwise than as directed thereby"), General Statutes § 14-242 (b) ("[a] signal of intention to turn right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning"), General Statutes § 14-242 (d) ("[n]o person shall turn a vehicle so as to proceed in the opposite direction upon any curve, or upon the approach to, or near the crest of, a grade, where such vehicle cannot be seen by the driver of any other vehicle approaching from either direction within five hundred feet, or at any location where signs prohibiting U-turns are posted by any traffic authority"), and General Statutes § 14-242 (e) ("[t]he driver of a vehicle intending to turn to the left within an intersection or into an alley, private road or driveway shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or within the area formed by the extension of the lateral lines of the private alley, road or driveway across the full width of the public highway with which it intersects, or so close to such intersection of public highways or to the area formed by the extension of the lateral lines of said private alley, road or driveway across the full width of the public highway as to constitute an immediate hazard"), with General Statutes § 14-234 (b) ("[t]he driver of a vehicle may overtake and pass, in a marked no-passing zone, pedestrians, parked or standing vehicles, animals, bicycles, electric bicycles, mopeds, scooters, electric foot scooters, vehicles moving at a slow speed, as defined in section 14-220, or obstructions on the right side of the highway, as listed in subdivision (2) of subsection (a) of section 14-230, *provided such overtaking and passing may be conducted safely, with adequate sight distance and without interfering with oncoming traffic or endangering traffic*, as defined in section 14-297" (emphasis added)), General Statutes § 14-241 (a) ("[b]oth the approach for a right turn and a right turn shall be made *as close as practicable* to the right-hand curb or edge of the highway" (emphasis added)), General Statutes § 14-241 (c) ("[a]t any intersection where traffic is restricted to one direction on one or more of the highways, the driver of a vehicle intending to turn left shall approach the intersection in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of such vehicle, and after entering the intersection the left turn shall be made so as to leave the intersection, *as nearly as practicable*, in the left-hand lane lawfully available to traffic moving in such direction upon the highway being entered" (emphasis added)), General Statutes § 14-242 (a) ("No person shall turn a vehicle at an intersection unless the vehicle is in a proper position on the highway as required by section 14-241, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a highway *unless such movement can be made with reasonable safety*. No person shall so turn any vehicle without giving an appropriate signal in the manner provided in section 14-244." (Emphasis added.)), and General Statutes § 14-242 (f) ("[n]o person operating a vehicle who overtakes and passes a person riding a bicycle, an electric bicycle or an electric foot scooter and proceeding in the same direction shall make a right turn at any intersection or into any private road or driveway *unless the turn can be made with reasonable safety* and will not impede the travel of the person riding the bicycle, electric bicycle or electric foot scooter" (emphasis added)).

[20] Our research reveals several other statutory rules of the road with similar language that appears superficially discretionary but channels or limits that discretion in a way that creates a ministerial duty. See General Statutes § 14-232 (a) ("(1) the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof *at a safe distance and shall not again drive to the right side of the highway until safely clear of the overtaken vehicle*; and (2) the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle and shall not increase the speed of his or her vehicle until completely passed by the overtaking vehicle" (emphasis added)); General Statutes § 14-232 (b) ("[n]o vehicle shall be driven to the left side of the center of the highway in overtaking and passing another vehicle proceeding in the same direction unless the left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made *without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken*" (emphasis added)); General Statutes § 14-233 ("The driver of a vehicle may overtake

and pass upon the right of another vehicle *only when conditions permit such movement in safety* and under the following conditions: (1) When the vehicle overtaken is making or has signified the intention to make a left turn; (2) when lines of vehicles traveling in the same direction in adjoining traffic lanes have come to a stop or have reduced their speed; (3) upon a one-way street free from obstructions and of sufficient width for two or more lines of moving vehicles; (4) upon a limited access highway or parkway free from obstructions with three or more lanes provided for traffic in one direction. Such movement shall not be made by driving off the pavement or main-traveled portion of the highway except where lane designations, signs, signals or markings provide for such movement.").

[21] "Section 14-283 permits the operators of emergency vehicles to disregard certain traffic rules in light of the circumstances. The term 'emergency vehicle,' as used in § 14-283 (a), includes 'any state or local police vehicle operated by a police officer . . . in the pursuit of fleeing law violators . . . .' Section 14-283 (b) (1) provides in relevant part that an operator of an emergency vehicle may '(B) . . . proceed past any red light or stop signal or stop sign, but only after slowing down or stopping to the extent necessary for the safe operation of such vehicle, (C) exceed the posted speed limits or other speed limits imposed by or pursuant to section 14-218a or 14-219 as long as such operator does not endanger life or property by so doing, and (D) disregard statutes, ordinances or regulations governing direction of movement or turning in specific directions.' The ability to disregard traffic rules is not, however, unlimited. By its terms, § 14-283 applies to state and local police vehicles only when 'operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators . . . .' General Statutes § 14-283 (a). Additionally, subsection (d) of § 14-283 provides: 'The provisions of this section *shall not* relieve the operator of an emergency vehicle from the duty to drive *with due regard for the safety of all persons and property*.' " (Emphasis in original.) *Borelli* v. *Renaldi*, supra, 336 Conn. 13.

[22] In our recent decision in *Borelli*, we concluded that the "due regard" requirement of § 14-283 (d) did not create a "ministerial, rather than [a] discretionary" duty for police officers "to weigh the safety of all persons and property and the seriousness of the offense *prior to initiating a pursuit* . . . ." (Emphasis added.) *Borelli* v. *Renaldi*, supra, 336 Conn. 14; see id., 16 ("the Uniform Statewide Pursuit Policy adopted pursuant to [General Statutes] § 14-283a contemplates that officers will exercise their judgment and discretion in giving due regard to the safety of all persons and property when determining whether to engage a pursuit"). We observed that the "phrase 'due regard' . . . rather than mandating a particular response to specific conditions, imposes a general duty on officers to exercise their judgment and discretion in a reasonable manner." Id., 14. We then stated that, "[b]ecause the requirement 'to drive with due regard for the safety of all persons and property' imposes a duty to exercise discretion, § 14-283 (d) falls squarely within the general rule of § 52-557n (a) (2) that municipalities 'shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.' Nothing in the language of § 14-283, which exclusively governs response to emergencies, supports the position that the legislature intended to impose anything other than a discretionary duty, or that it intended to delineate an exception to § 52-557n." Id., 15 n.6; see id., 23–24 (rejecting plaintiff's argument that, "because the statutory language mandates that police officers drive with due regard for safety, there is no discretion to drive without such regard," thus rendering that duty ministerial because "[t]he core distinction between the two types of duty lies not in whether the duty is mandatory, but in whether the performance of that duty will inherently require the municipal actor to exercise judgment").

Because *Borelli* was *not* a driving case, we emphasize that it does not stand for the proposition that emergency driving pursuant to § 14-283 is itself a discretionary activity for purposes of governmental immunity. See id., 4 ("although the plaintiff's complaint reasonably may be read to have raised the issue of whether governmental immunity shields officers with respect to the *manner* of driving while pursuing a fleeing motorist, *her argument on appeal focuses exclusively on whether governmental immunity applies to an officer's decision to engage in such a pursuit*" (emphasis altered)). We leave for another day whether emergency operation changes driving from a ministerial to a discretionary task.

We note, however, that several Superior Court decisions have concluded

that *emergency* operation under the privilege conferred by § 14-283, and particularly the "due regard" standard of § 14-283 (d), is a discretionary act for purposes of governmental immunity. See, e.g., *Kajic* v. *Marquez*, Docket No. HHD-CV-16-6065320-S, 2017 WL 439963, *2, *7–8 (Conn. Super. August 16, 2017) (response to report of assault with firearm); *Parker* v. *Stadalink*, Superior Court, judicial district of Waterbury, Docket No. UWY-CV-13-6020769-S (May 4, 2016) (62 Conn. L. Rptr. 281, 284–86) (operation of police cruiser during high-speed pursuit); *Paternoster* v. *Paszkowski*, Docket No. FBT-CV-14-6042098-S, 2015 WL 5809623, *6 (Conn. Super. September 1, 2015) (operation of police cruiser during high-speed pursuit). For a rejoinder to this line of Superior Court cases, see Judge Povodator's comprehensive decision in *Torres* v. *Norwalk*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-CV-16-6029691-S (May 2, 2018) (66 Conn. L. Rptr. 548, 556–59), and the concurring and dissenting opinions in *Borelli*. See *Borelli* v. *Renaldi*, supra, 336 Conn. 39 (*Robinson, C. J.*, concurring); id., 114–15 (*Ecker, J.*, dissenting).

These Superior Court decisions and a broad reading of *Borelli* gave rise to a recent legislative response, albeit one that was vetoed by Governor Ned Lamont with an explanation that is instructive as we consider the governmental immunity issue before this court. See *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 184–85, 162 A.3d 706 (2017) (relying on veto message accompanying gubernatorial veto of amendment to municipal employee pension statute in determining employee's eligibility to collect disability pension while employed as mayor of municipality). Specifically, the legislature passed Senate Bill No. 204, 2022 Sess., as No. 22-22 of the 2022 Public Acts, "An Act Concerning Damages to Person or Property Caused by the Negligent Operation of a Motor Vehicle Owned by a Political Subdivision of the State." Senate Bill No. 204 would have amended § 52-557n (a) (2) by adding the following language: "Notwithstanding the provisions of subparagraph (B) of this subdivision, governmental immunity shall not be a defense in a civil action for damages to person or property caused by the negligent operation of a motor vehicle owned by a political subdivision of the state." Public Acts 2022, No. 22-22, § 1. On May 26, 2022, Governor Lamont vetoed Senate Bill No. 204, explaining his concern about the breadth of the bill, notwithstanding the legislature's apparent intention to create "parity" in liability for the negligent operation of motor vehicles as between municipalities and the state, for which sovereign immunity is waived by General Statutes § 52-556. Letter from Governor Ned Lamont to Denise W. Merrill, Secretary of the State (May 26, 2022) p. 2, available at https://portal.ct.gov/-/media/Office-of-the-Governor/Bill-notifications/2022/Bill-Notification-2022-13.pdf (last visited August 22, 2022). Governor Lamont expressed concern that it was "not evident whether in doing so, the legislature fully considered that unlike the state, municipalities face greater exposure by the simple fact that they have more emergency vehicles on the roads every day." Id. Relying on legislative testimony submitted by the Connecticut Conference of Municipalities, however, Governor Lamont emphasized: "Currently, public employees operating municipal vehicles *do not have the discretion to disregard motor vehicle laws*. They have a mandatory duty to abide by these laws and a municipality may be liable for an employee's negligent driving." (Emphasis added.) Id., p. 1; see id., p. 2 (Governor Lamont observed that Senate Bill No. 204 "eliminates completely the doctrine of governmental immunity for a municipality in the operation of a [town owned] vehicle. *This change could entail, for example, that a police officer's decision to pursue a fleeing law violator is not a discretionary act and therefore governmental immunity does not apply.* In that regard, I am concerned that the bill may inadvertently have gone too far." (Emphasis added.)); see also Written Testimony, Connecticut Conference of Municipalities (March 4, 2022) available at https://www.cga.ct.gov/2022/JUDdata/Tmy/2022SB-00204-R000304-The%20Connecticut%20Conference%20of%20Municipalities%20-CCM-TMY.PDF (last visited August 22, 2022); Written Testimony, Connecticut Trial Lawyers Association (March 4, 2022) available at https://www.cga.ct.gov/2022/JUDdata/Tmy/2022SB-00204-R000304-The%20Connecticut%20Trial%20Lawyers%20Association-TMY.PDF (last visited August 22, 2022); Written Testimony, Attorney Thomas R. Gerarde on behalf of the Connecticut Conference of Municipalities (March 3, 2022) available at https://www.cga.ct.gov/2022/JUDdata/Tmy/2022SB-00204-R000304-Gerarde,%20Tom,%20Connecticut%20Conference%20of%20Municipalities-TMY.PDF (last visited August 22, 2022). Although the legislative proceedings concerning Senate Bill No. 204 are instructive with respect to the issue before us, which does *not* concern emergency vehicle operation under the aegis of § 14-283; see footnote 27

of this opinion and accompanying text; we nevertheless emphasize that the present case affords us no occasion to consider the extent to which governmental immunity extends to that unique context, and we decline to do so.

[23] Our research reveals that a recent decision from the Minnesota Court of Appeals has drawn a distinction between various provisions of the statutory rules of the road, observing that some create ministerial duties whereas other "less definite" provisions require the exercise of judgment, creating a discretionary duty. *Vanschaick* v. *Letourneau*, Docket No. A20-0705, 2021 WL 417024, *3 (Minn. App. February 8, 2021), review denied, Docket No. A20-0705, Minnesota Supreme Court (April 20, 2021); see id., *1–4 (assuming that state trooper was required to obey traffic laws in stopping speeding motorist but concluding that "less definite" statutes, such as those requiring turns to be made " 'safely,' " require exercise of judgment, creating discretionary duty). The Appellate Court's opinion in the present case contains a similar observation. See *Daley* v. *Kashmanian*, supra, 193 Conn. App. 188–89; see also footnote 8 of this opinion. We disagree with this approach as inconsistent with our legislature's intent to preserve liability for vehicular negligence under § 52-557n, as well as the effect of § 14-283 on the rules of the road provided by the motor vehicle statutory scheme.

[24] For a discussion of the open debate concerning the application of governmental immunity to the operation of emergency vehicles under the privileges of § 14-283, see footnote 22 of this opinion.

[25] We note that Judge Povodator's relatively recent decision in *Torres* v. *Norwalk*, supra, 66 Conn. L. Rptr. 548, is the most comprehensive Superior Court decision on this point, with its recent vintage reflecting the evolution of this court's discretionary act immunity jurisprudence after the enactment of § 52-557n.

[26] Consistent with the decisions of some of our trial courts; see footnote 22 of this opinion; some of our sister states draw a distinction between emergency and nonemergency operation for purposes of governmental immunity under a ministerial/discretionary regime. See, e.g., *Davis* v. *Lambert-St. Louis International Airport*, 193 S.W.3d 760, 763–64 (Mo. 2006) (emergency response to call for assistance by fellow officer); *Woods* v. *Moody*, 933 S.W.2d 306, 308 (Tex. App. 1996) (observing that, "[u]nlike [high-speed] chases or traffic stops, operating a car in a [nonemergency] situation does not involve personal deliberation or the exercise of professional expertise, decision, or judgment," in holding that, "absent special circumstances that suggest the officer was performing a discretionary function, such as engaging in a [high-speed] chase . . . an officer driving a motor vehicle while on official, [nonemergency] business is performing a ministerial act"); *McBride* v. *Bennett*, 288 Va. 450, 457–58, 764 S.E.2d 44 (2014) (emergency response to domestic violence call). Because this case does not concern emergency operation, and particularly because the extent to which governmental immunity should extend to the emergency operation of municipal vehicles pursuant to § 14-283 has been the topic of recent legislative attention; see footnote 22 of this opinion; we need not and do not address the extent to which emergency operation and nonemergency operation are distinct for purposes of governmental immunity.

[27] As we previously noted, the legislature recently enacted Senate Bill No. 204, which Governor Ned Lamont subsequently vetoed, in an effort to clarify the scope of governmental immunity with respect to the negligent operation of motor vehicles. See footnote 22 of this opinion. Similarly, should the legislature determine that public policy favoring effective law enforcement requires an expansion of the scope of § 14-283 to exempt certain types of nonemergency motor vehicle operation from the ordinary rules of the road, it is well equipped to make those changes. Cf. Wis. Stat. Ann. § 346.03 (4) (a) and (b) (West 2019) (The Wisconsin emergency vehicle statute authorizes law enforcement officers to exceed the speed limit without "giving audible and visual signal" if "the officer is obtaining evidence of a speed violation" or "is responding to a call which the officer reasonably believes involves a felony in progress and the officer reasonably believes any of the following: 1. Knowledge of the officer's presence may endanger the safety of a victim or other person. 2. Knowledge of the officer's presence may cause the suspected violator to evade apprehension. 3. Knowledge of the officer's presence may cause the suspected violator to destroy evidence of a suspected felony or may otherwise result in the loss of evidence of a suspected felony. 4. Knowledge of the officer's presence may cause the suspected violator to cease the commission of a suspected felony before the officer obtains sufficient evidence to establish grounds for arrest.").